JOURNAL ENTRY OPINION
In considering the evidence properly before this court, we find that the county did not meet its burden of showing, by clear and convincing evidence, that appellants' minor children were neglected. Because the state failed to meet its burden on the initial question of neglect, the trial court's award of permanent custody in this case was error. We, therefore, reverse the judgment of the trial court and vacate its order of permanent custody.
Defendants-appellants appeal the trial court's granting of permanent custody of their five children to the county. The parents were represented separately in the juvenile court adjudicatory/dispositional hearing and their cases were consolidated for appeal. The account of facts that follows is based on the only record in this case.
Mother had her first child by her first husband at age eighteen and then two more children. After her first marriage ended, she had three more children by her second husband, who is the other appellant in this case. All the children are boys: at the time of the hearing the oldest was ten years old, and the youngest almost two. Mother's involvement with the county system began during her first marriage when her children were removed from her home several times.
In 1995, after he had been put to bed for the night, mother's three-year-old son Jacob leaned over the second story porch to show his birthday present to the little girl next door when he fell and sustained permanent head and lung injuries, which required special care. After a year and a half in a hospital, he was discharged to a foster family. The county gained permanent custody of this child in November of 1998.[1]
The county took temporary custody of the remaining two children (the other three boys had not yet been born). When mother completed her case plan with the county, her children were returned to her. In August of 1996, she married Toby Tackett (father)[2], who is the father of all the children born after the marriage. In 1997, the children were again removed from the parents' custody when father was accused of injuring one of the sons. The parents completed their case plan, which included domestic violence counseling, parenting education classes, and drug and alcohol assessment. By this time, they had had two more children. Thus a total of four children resided at home, and Jacob with the county. The court released two of the children to the parents and gave permanent custody of the other two to mother's sister, Aunt Brenda.
Eight months later, the parents moved to Pike county in southern Ohio. Aunt Brenda returned the two children to the parents. Because the aunt misunderstood her legal counsel's advice regarding the proper procedure to follow, she never legally relinquished legal custody of the two boys. After the county was informed that the children were residents of Pike County, their case in Cuyahoga County was closed and jurisdiction transferred to Pike county. The social worker in Pike county found no problems with the family or the home they were living in.
In July of 1998, the family moved back to Cleveland because the mother's father was dying. When they first arrived in Cleveland, they stayed with a friend who had let them stay with her before. In order to take care of her father, mother then moved in with her sister Brenda, where mother's father was staying. At the time, all of mother's furniture was still in Pike County. Father did not move into the aunt's home, but rather moved in with a girlfriend. Three days after mother's father died, mother moved into an apartment. Not having money for a deposit, she negotiated with the landlord to perform repairs to the place instead and proceeded to paint and clean. Unfortunately, less than a week after moving in, the oldest boy was hospitalized with asthma and discharged a week later. Two days after the oldest was discharged, the youngest boy was hospitalized with asthma-related respiratory problems.
On October 26, 1998,[3] while the youngest boy was still hospitalized, mother put the children down for a nap, under the supervision of the ten-year-old, and went next door to phone the hospital. She also phoned her husband to ask him to watch the children while she went to the hospital. While she was gone, a neighbor called the authorities to complain that five children were home alone. One county social service worker stated that when she and the police arrived, the mother was sitting on the porch steps. As the county worker was about to go upstairs, a small child in diapers and a dirty tee shirt was coming down the stairs with only one shoe. Mother testified that the small boy was dressed in his tee shirt and diaper because he had been put down for a nap. While the police and social workers were in the home, the father arrived.
The children were taken into emergency custody, and a special meeting was called with the social workers and the parents to discuss the situation. The county maintained emergency custody of the children after this meeting.
On September 30, 1999, the permanent custody hearing was held. The guardian ad litem did not file her report until weeks after the judgment entry awarding custody to the county. The parents filed separate appellate briefs.
Mother's Assignment of Error No. 1:
 IN DENYING A MOTION TO DISMISS WHEN THE STATE DID NOT PROVE AN ESSENTIAL ELEMENT OF NEGLECT, THE TRIAL COURT VIOLATED MS. TACKETT'S STATE AND FEDERAL DUE PROCESS RIGHTS AND IGNORED THE REQUIREMENTS OF JUV. R. 29(F)(1).
Mother's first assignment of error argues that the trial court erred in determining that her children were neglected. We agree. By agreement of the parties, the court held the adjudicatory and dispositional hearings at the same time. The county had to prevail, however, first on the issue of neglect in order to proceed on the issue of permanent custody. Moreover, different rules of evidence control these two issues. As the Supreme Court of Ohio explained,
 The law commands that the proceedings be bifurcated into separate adjudicatory and dispositional hearings because the issues raised and the procedures used at each hearing differ. The issue at the adjudicatory stage of a dependency case is whether petitioner has proven, by clear and convincing evidence, that the child is in fact dependent. The issue at the dispositional stage involves a determination of what is in the child's best interests.
 There must be strict adherence to the Rules of Evidence at the adjudicatory stage. Yet, any evidence that is material and relevant, including hearsay, opinion and documentary evidence, is admissible at the dispositional stage. Juv.R. 34(B)(2).
In Re Baby Girl Baxter (1985), 17 Ohio St.3d 229, 233; 479 N.E.2d 257,260-261.
Both parents claim that the county did not prove by clear and convincing evidence that the children were neglected. A neglected child is defined in R.C. 2151.03:
 (A) As used in this chapter, neglected child includes any child:
* * *
 (2) Who lacks adequate parental care because of the faults or habits of the child's parents * * *;
 (3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well-being * * *;
 (6) Who, because of the omission of the child's parents * * *, suffers physical or mental injury that harms or threatens to harm the child's health or welfare * * *.
Juv.R. 29(F)(1) addresses Procedure upon determination of the issues. It states, [u]pon the determination of the issues, the court shall do one of the following: (1) [i]f the allegations of the complaint were not proved, dismiss the complaint * * *.
The state has the burden of establishing, by clear and convincing evidence, that a child is neglected. R.C. 2151.35(A); Juv.R.29(E)(4). The standard of clear and convincing evidence requires that the proof produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954), 161 Ohio St. 469,120 N.E.2d 118. As stated by the Ohio Supreme Court in State v. Schiebel (1990), 55 Ohio St.3d 71, 74-75, 564 N.E.2d 54:
 Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. Ford v. Osborne (1887), 45 Ohio St. 1, 12 N.E. 526, paragraph two of the syllabus. However, it is also firmly established that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court.
Schiebel, supra.
In the case at bar, in order to support its claim that the mother failed to provide adequate parental care, the county argues the following: (1) the mother failed to have William's asthma prescription filled; (2) she failed to provide the children with adequate and stable housing; (3) she failed to benefit from her parenting classes; (4) she fought with their father in front of the children during visitation; and (5) she failed to visit the children on a regular basis, which failures had a deep effect on William. Brief pp. 11-14.
The county argues that mother failed to provide adequate medical care for the oldest boy, because she had not filled his asthma prescriptions after he was discharged from the hospital. That the prescription was not filled by that date, however, does not show inadequate medical care. Mother explained that he still had enough medicine for several days. In fact he had two inhalers, which would usually last about a week, and vials of liquid abuterol for a machine that was used only if the hand pumps did not work. (Tr. 67.) She had, moreover, initiated the procedure for acquiring the medicine from Metro Hospital without payment because she did not have sufficient funds at the time. This testimony is undisputed. Since there was no showing that the child suffered from her decision to wait until she was able to establish her eligibility at Metro Hospital and since her economic means indicate a common and logical explanation, this example does not demonstrate inadequate parental care because of the faults or habits of the parents.
The county's second claim is that the children lacked adequate and stable housing. First, the events immediately preceding the investigation must be noted. On October 9, the mother and her children moved into the West 58th Street apartment upstairs. Unable to provide a security deposit, she negotiated with the landlord to make repairs herself in lieu of a security deposit. On October 14th William was suddenly taken to the hospital with chronic asthma. During the emergency the mother stayed 18 hours a day at the hospital. (Tr. 22.) Any review of the apartment during this unusual time must take into consideration not only her financial limitations, the newness of her arrival, and her interrupted work in fixing up the apartment, but also the personal hardship of a woman, alone, trying to be at the hospital to attend to an emergency. Moreover, social worker Regina Burton described the condition of the apartment as follows: [t]here was a neatness in the way everything that she did have in the home arranged. (Tr. 167.)
The record also confirms that both social workers Michele Lee and Regina Burton acknowledged that other types of assistance were available, such as a parent aide, but that no such offer of assistance was ever made to mother. (Tr. 105, 168-169). The county could have helped mother, especially at this difficult time, but it chose to do nothing.
In its appellate brief, the county offered only one example of unstable housing: the mother resided in various places after the children were removed from her care. As mother properly noted in her reply brief, the housing of the mother after the children were removed is not relevant to neglect.[4] Such information goes to the second stage, not the determination of neglect.
Again conspicuously absent from its appellate brief, as well as closing argument at the trial, is the social worker's claim that the lack of both food and appliances in the home showed that the mother failed to provide the necessary subsistence required. Mother countered this claim by stating that the family took their meals with the family downstairs and, therefore, that the appliances and their food were kept down there. She explained that she did not have a stove but had a refrigerator her brother had given her and a dining room set, so she shared her resources. Nothing in the record refutes this explanation. More important, the social workers agreed that the children were well nourished. (Tr. 96.)
Explaining the county's concern about stable housing, Michele Lee from the Department of Children and Family Services testified there was no stove, no food, no refrigerator, no beds in the home, only mattresses. (Tr. 31, 61.) Michelle Lee, however, was not present on October 26, 1998 because she was ill. Therefore, her testimony could provide only the reasoning of the county department; it may not be used to establish the truth of the matter asserted. Lee's testimony about the home was derived from a case summary presumably dependent upon Regina Burton's observations, because Burton replaced Lee that day. Lee's testimony, therefore, cannot be used to corroborate Burton's observations about the condition of the home. Regina Burton reported that one mattress and box spring rested on milk crates[5] and the rest of the mattresses were on the floor. However, the mother testified there were only two single mattresses on the floor, a playpen where Steven slept, a couch where she slept, and her father's bed, in which two of the children slept. Her sister, by no means an uncritical witness, testified that she had sent their father's bed to the apartment and thus corroborated this detail about the bed.
Regina Burton also reported flying cockroaches and broken glass on the floor. Mother, however, stated the landlord had sprayed approximately three days earlier, and her sister confirmed that she observed dead cockroaches.[6] This detail is important in understanding how mother was striving to improve her home. An additional problem with Burton's testimony is that it is inconsistent. The same social worker also testified as follows:
 There was a neatness in a way everything that she did have in the home was arranged. * * * The clothes were — some clothes was in the drawer, and some were in big plastic bags. The couch was neatly made, she had a sheet or something over it. The table was cleaned, the chair was cleaned, and the floor was swept. It just made me say that there was some housekeeping done. (Tr. Sept. 30 p. 167.) (Emphasis added.)
Testimony that reports broken glass on the floor and yet describes the floor as swept is seriously flawed, such as to question the competency or credibility of the witness. Whereas the county workers make much ado about the condition of the house, it is understandable why counsel for the county, both in concluding argument before the trial court and in the appellate brief, ignores this claim about a lack of stable housing. And so must we.
Similarly defective is the county's example that mother failed to benefit from the parenting classes she attended. Again, the parenting classes occurred after the children were removed. Mother properly objects that this example cannot prove the neglect upon which the children's removal was based. What is significant, on the other hand, is that she attended those classes while under no court order to do so. This willingness demonstrates her commitment to her children, not her neglect.
A fourth concern is the claim that mother and father fought with each other in front of the children. The county's brief cited only one instance during her visitation. Mother explained, however, that this argument occurred outside the presence of the children as she was leaving and the father was arriving. No one with first-hand knowledge refuted mother's explanation. Moreover, the issue of this dispute was the failure of the Center to present the children on time and the mother's loss of her full time to visit with the children. Again, what this conflict showed is a mother intensely eager to be with her children, not a neglectful mother. And had the children heard this dispute, they would have had reconfirmed the degree of their mother's commitment to them.[7]
The county claims, however, the altercation was so serious that the center's security officers were called to intervene. The county erroneously relies on this incident. While it is true that intervention occurred once, it was between father and a caseworker, not between the mother and father. Thus the example does not illustrate parental neglect. These examples, furthermore, illustrate a pattern of faulty extrapolations by the county that go beyond the facts.
While ignoring the mother's desire and right to use the full time allocated under the visitation schedule, the county also argues that the mother did not regularly visit her children. The county ignores, however, the mother's reasonable and undisputed explanations the costs of transportation and the conflicts with her work schedule.
Similarly lacking support in the record is the court's explanation that the parent(s) have failed or refused to * * * visit or communicate with the children when able to do so * * *. Journal Entry dated 10-12-99. There is no evidence that the mother did not visit her children when she was able to. In determining the mother's ability to visit her children, the court failed to consider her work schedule.
The county observed, further, that William, the eldest child, was deeply affected when the mother was unable to visit. This observation, however, appears to indicate a deep bond between the children, not the mother's neglect. As with all the other examples the county has offered to show neglect, the county's examples here are defective.
The county also notes that Patrick Washington, a Metzenbaum Center employee, observed that mother was tired at the end of the visits. It is certainly a distortion of Mr. Washington's testimony, however, to single out her occasional and understandable moments of fatigue as a reason to give permanent custody to the state. The county's argument, furthermore, ignores the rest of Washington's testimony:
 Q: I think, correct me if I'm wrong, its your testimony the mother fairly regularly showed up. Your concerns were with Toby, the father?
 A: Yes, the mother did show up, yes. And often-times, she would be timely. I mean, I would say even earlier, because I think there were occasions when she made reference to using public transportation, and she would be timely and would bring the children various little treats or whatever.
(Tr. 177-179, 186.) Moreover, since these visits occurred after the children were removed, they cannot be evidence of neglect before the children were removed.
The five examples the county cites in its brief all fail, even when considered together, to demonstrate neglect. What is most difficult to understand is the county's claim that the mother was inattentive in the past to her first son because she was not at his side during his surgery and, on the other hand, the claim she neglected her other children when she went next door only to find someone to watch the children so she could attend to another son in the hospital. Although conspicuously absent from the county's appellate brief, this latter claim was made at the trial level. Specifically, in its concluding argument at the custody hearing the county stated, she continued to make another bad choice by leaving these four children home alone in an upstairs apartment with a window open. And whether it was open three inches, four inches or five inches, those children were home alone and they could have opened it the rest of the way. (Tr. 413.)
There is no evidence whatsoever that these particular children could have raised the window further. The record does not show how difficult or how easy it would be to raise this window, nor does the record show how high the window was from the floor. We know that most of the children were too small to open a window.
At the September 30th hearing, neither the police nor the neighbors ever testified about the actual circumstances on October 26, 1998. Of the social workers who testified at the September 30th hearing only one was present at the home that day. She stated as follows:
 We had a priority one call from the Cleveland Police, stating that there was five children home alone. We went to the home, and, by the time the police and myself got there, the mother had come back. In the meantime, me and another worker had went into the home, and investigated to make sure that the children were in a safe setting.
 By the time we come around the side, to come to go upstairs to where they live, the littlest one, he came down.
In other words, the social worker did not talk to the neighbors and did not herself observe any children outside the home. It was her testimony that the youngest came down from the upstairs apartment after she arrived and after the mother had returned. According to the mother, the youngest child had been napping and was still dressed for a nap. She said she was gone, at most, only fifteen minutes to call the hospital and left the oldest boy in charge of the younger ones. There is no evidence to refute her estimate.
Because the case for a lack of stable housing does not meet the clear and convincing standard before the trial court and because there was no demonstrated harm that befell the children as a result of the mother's fifteen-minute absence, the question is whether leaving young children in the care of a ten-year-old for a five- to fifteen-minute absence in itself demonstrates neglect.
The mother depended upon the fact that the younger children were napping. According to Regina Burton, the mother was back at the steps before she and the police arrived. It could take a mother fifteen minutes to take the trash out or monitor the wash in the basement or any number of tasks that mothers engage in. A mother cannot haul five children by her side. The fact that the children apparently awakened and were moving about is not the issue. While a ten-year-old child is clearly not likely to be able to deal with emergencies, such a child might serve as an alarm to call back a parent who is nearby. And this mother was nearby.
The facts and evidence presented at that hearing demonstrate the state did not satisfy its burden of proving neglect according to a clear and convincing evidentiary standard. The county has failed to prove neglect by competent and credible evidence. Therefore, mother's first assignment should be sustained.
Father's Assignment of Error No. 2:
 THE JUVENILE COURT DID NOT HAVE CLEAR AND CONVINCING EVIDENCE SUPPORTING ITS DETERMINATION OF NEGLECT.
Father assigns two issues to this assignment of error. The first claims that the trial court did not have sufficient evidence to support its determination of neglect. Again, we agree that the state did not meet its burden of proving neglect under a clear and convincing standard.
Father argues that because he was not living in the children's home he was not responsible for the conditions which caused the children to be taken into custody. The evidence shows, however, he provided little financial or parental care to them.[8] Mother testified that she was forced to take this apartment and assume its repairs because it was all that she could afford. Despite the fact that he was living with his girlfriend, father could have provided more support. Mother testified that father provided her with some money for food and diapers, but obviously what was provided was not sufficient without the help of the mother's family and the extra work of the mother in preparing the apartment. That he chose to live elsewhere does not absolve him of responsibility for their well-being.
Further, father's absence decreased the time the mother had to attend to the children who were hospitalized. Having just lost her father and having two hospitalized children, mother had many burdens. Father's limited assistance coping with this crisis would certainly constitute neglect were it not for the extraordinary efforts of the mother. Despite his minimal assistance, however, the record does not show the children suffered physical or mental injury. For the reasons we discussed under Assignment of Error No. 1, the trial court erred in finding that the children were neglected by their parents, taken together.
Mother's Assignment of Error No. II:
 THE TRIAL COURT VIOLATED MS. TACKETT'S STATE AND FEDERAL DUE PROCESS RIGHTS BY COMMITTING HER CHILDREN TO PERMANENT STATE CUSTODY WHEN THE STATE FAILED TO PRESENT CREDIBLE EVIDENCE THAT THE CHILDREN COULD NOT RETURN HOME WITHIN A REASONABLE TIME OR SHOULD NOT RETURN HOME.
Mother's Assignment of Error No. III:
 THE TRIAL COURT VIOLATED MS. TACKETT'S STATE AND FEDERAL DUE PROCESS RIGHTS BY COMMITTING HER CHILDREN TO PERMANENT STATE CUSTODY WHEN ALL RELEVANT, CREDIBLE EVIDENCE SUPPORTED A TEMPORARY CUSTODY DISPOSITION.
Father's Assignments of Error Nos. I and III:
 THE JUVENILE COURT ABUSED ITS DISCRETION IN DETERMINING CLEAR AND CONVINCING EVIDENCE SUPPORTED ITS DECISION TO AWARD PERMANENT CUSTODY TO THE CUYAHOGA COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES.
 THE JUVENILE COURT ABUSED ITS DISCRETION IN FINDING THE AWARD OF PERMANENT CUSTODY TO THE CUYAHOGA COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES WAS IN THE BEST INTEREST OF THE CHILD.
Mother's second and third assignments of error and father's remaining assignments of error, collectively, argue that the state did not present sufficient evidence for the court to award permanent custody to the state. Again, we agree and sustain mother's and father's assignments of error. However, since the dispositional issue of placement does not arise unless neglect has been demonstrated, the issues raised in these assignments of error are moot.
Nonetheless, we are compelled to comment briefly on appellant's second and father's remaining assignment of error. Appellants argue that there was insufficient evidence for the court to decide that their children could not return home. We agree.
In order to terminate parental rights and award permanent custody to a public children's services agency, a juvenile court must find by clear and convincing evidence that: (1) the grant of permanent custody to the agency is in the best interest of the child; and (2) the child cannot be placed with either parent. R.C. 2151.414(B) and (E); In re: Robert Martin, et al. (Aug. 2, 2001), Cuyahoga App. No. 78440, unreported, 2001 Ohio App. LEXIS 3396; In re: Thomas (Mar. 9, 2000), Cuyahoga App. Nos. 75330, 75331, 75332, unreported, 2000 Ohio App. LEXIS 885. In reviewing awards of permanent custody, an appellate court must focus its attention on the existence of some competent, credible evidence to support the trial court's award. Thomas, supra.
During the September 30th hearing, the state did not present sufficient evidence to support the trial court's judgment that the children should not be returned home. At that hearing Michele Lee admitted that since October 1998, when the children had been removed, she had not ever inspected the home where appellant was living. And though she had gone to the house twice, both visits were unannounced and at times when appellant and her husband were most likely at work. (Tr. 40, 44, 71-75.)
Michele Lee additionally admitted that the state is pursuing permanent custody because of the conditions of the home back in October 1998 and Jacob's case. (Tr. 105.) The state presented no evidence about the home in which the family was actually living in September 1999. Instead, the trial court relied upon the initial conditions of removal in October 1998. We strenuously object to any determination of permanent custody when, during the eleven months that lapsed between October 1998 and September 30, 1999, no one had investigated the parents' home.
The trial court also ignored the only testimony which was presented during the hearing and which provided a description of the children's condition after the October 1998 removal. During the hearing Robin Jarvis testified that when she saw the children at the Metzenbaum Center while they were in foster care they were filthy and not being taken care of nearly to the point that * * * [she] had seen them being taken care of when they were with their own parents. (Tr. 222-223.) This testimony is relevant to deciding what is the best interest of the children. Nor has the state addressed evidence that the children could have been placed with both parents at their 94th Street address. The testimony of family friend Robin Jarvis supports a finding that the three-bedroom home where the family was living in September 1999 was owned by her and in good condition. Jarvis also told the court that she is willing to allow the family to remain in her home. (Tr. 221-236.)
R.C. 2151.414 et seq. specifically allows a parent the opportunity and time to improve upon the conditions that may exist at the time of removal. The county made no effort to observe whether those conditions had changed. Thus it did not meet its burden.
The award of permanent custody to the state has often been compared to the death penalty. We scrupulously observe rules for the death penalty. We can be no less careful in determining permanent custody. The record in this case does not demonstrate competent or credible evidence necessary to support an award of permanent custody to the state. Thus we sustain the above-cited assignments of error.
Mother's Assignment of Error No. IV:
 THE TRIAL COURT ERRED IN FINDING THAT REASONABLE EFFORTS WERE MADE TO RETURN MS. TACKETT'S CHILDREN WHEN THE RECORD REVEALS UNREASONABLE CASE PLANNING AND CASE MANAGEMENT.
In her fourth assignment of error, mother argues that the trial court erred in finding that the state made reasonable efforts to return the children. Mother claims that whatever efforts were made cannot be deemed reasonable in light of the poor case management and case planning she received from the state. We agree.
Mother alleges that the county did not provide her with a reasonable case plan. O.R.C. 2151.419 states in pertinent part
 the court shall determine whether the public children services agency * * * that filed the complaint in the case * * * has made reasonable efforts to * * * make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. * * * In determining whether reasonable efforts were made, the child's health and safety shall be paramount.
S2151.419(A)(1). Mother argues that, if the agency had provided her with assistance instead of taking her children, she could have gotten back on her feet. The only intervention needed in this case was short-term assistance with housing, child care and food.
The record shows that had [the county] provided that assistance for a few months, this family would now be intact. Appellant's Brief at 33.
Mother's current case plan[9] required her to complete parenting education and provide safe and stable housing for her children. Although the social worker referred mother to two parenting classes, the social worker provided no assistance to her in obtaining housing, furniture, or housewares. Because she was separated from her husband at this time, mother had limited resources for acquiring what she needed. Much of her furniture and household items had been left behind in Pike County when she came home to help care for her father. The county provided mother with no assistance in following this portion of the case plan. (Tr. 105, 168-169.) The county's only assistance was in removing the children; it did little to help the family to solve the problems facing it.
Mother also argues that because the case plan's goal was reunification, the county had a duty to make a good faith effort to assist the parents in completing the plan so the family could be reunited. Mother testified that she tried to enroll in a parenting class but that the county worker had failed to provide her with the necessary paperwork for the program. When she tried to follow up directly with the parenting class provider, the enrollment period had expired. She testified that her subsequent attempts to enroll in the classes also failed because the county failed to provide her with the necessary paperwork. Thus the lack of county assistance contributed to the overall failure of the case plan. We believe it significant that there were avenues of assistance available to mother never offered to her. (Tr. 105, 168-169.)
Mother's fourth assignment of error is sustained.
Because the state failed to show neglect, the trial court should have dismissed appellee's complaint. We, therefore, reverse the judgment of the trial court and vacate its order of permanent custody.
Finally, we are compelled to clarify our major points of disagreement with the dissenting opinion. Our initial point of disagreement arises from its improper judicial notice of substantive facts set forth in an earlier and related case entitled In the matter of: Jacob William Hauserman (Feb. 3, 2000), Cuyahoga App. No. 75831, unreported (Hauserman I). There exists no authority to support the majority's reliance upon Hauserman I. The dissent has exceeded the proper scope of its review by incorporating facts from Hauserman I. Its conclusion, therefore, is flawed for the simple reason that it ignores the actual and only record pertinent to this appeal, that is, the facts and evidence presented to the trial court during the combined adjudicatory and dispositional hearing on September 30, 1999. Our criticism is supported by two uncontroverted facts: Hauserman I involved only one appellant, Armina Tackett, mother of the minor child, Jacob Hauserman, whose permanent custody was the only issue before the court in that case. The case at bar, however, has an additional appellant, Toby Tackett.
The law is clear that a court of appeals may not take judicial notice of its records in a previous case unless that case involves the same subject matter and the same parties. National Distillers Chemical Corporation v. Limbach (1994), 71 Ohio St.3d 214, 643 N.E.2d 101 (a reviewing court may not take judicial notice of adjudicative facts in an earlier case if the issues are different)[10]; Cook v. Guardian Trust Co. (1945), 43 Ohio L. Abs. 318 (judicial notice of record in prior case improper unless both cases involve the same subject matter and party).
In the case at bar, the dissenting opinion has permitted itself to draw from the record in Hauserman I by assuming facts not in evidence in this appeal. In the case now before us, the parties are different because now both mother and father, Toby Tackett, appeal the trial court's decision granting permanent custody of their remaining five children[11] to the county. And unlike Hauserman I, this case involves custody issues relating to the Tacketts' other minor children. The parties and the subject matter of this appeal, therefore, are distinct from Hauserman I.
We underscore the fact that the permanent custody hearings held in Hauserman I and in this case occurred on different dates and in different years, November 5, 1998 and September 30, 1999, respectively. Therefore, the facts relevant to the case at bar extend well beyond the time frame of Hauserman I. All these differences are material to and form the basis for our fundamental disagreement with the dissenting opinion.
To support the trial court's finding of neglect, the dissent has improperly relied on facts from Hauserman I and has distorted or otherwise ignored facts from the September 30th hearing. To support taking judicial notice of Hauserman I, the dissent relies upon a case that not only does not support the dissent's position; in fact, it expressly denies it. In Hauschild v. City of Cleveland (1958),105 Ohio App. 444, this court held it did not consider an earlier case as a predicate to deny certain rights at issue in the second case for the same reasons that apply here: the parties were not the same. Contrary to Hauschild, the dissent would have this court rubber stamp the lower court by relying upon another case with different parties and different witnesses. We are compelled to emphasize that the Hauschild court specifically held that because different parties were involved, it could not rely upon the facts established in the prior case, even though the two matters were related. We are controlled by this court's published ruling in Hauschild. Our conclusions in the case at bar are based upon and exclusively drawn from a review of the only record in this case, that is, the transcript of the proceedings which occurred on September 30, 1999.
Not restricting itself to that record, however, the dissent finds, in part, that the children lived surrounded by trash; that they were poorly-clothed (some of them did not own shoes; others were inappropriately dressed for the weather) and were forced to sleep on mattresses suspended by milk crates; that the length of time mother was gone is open to dispute and was long enough that neighbors called the police because the poorly-clothed children were wandering in the street; and that the children were poorly fed and ill-clothed. These assertions are not supported by the record in this appeal.
First, there is no evidence in this record about the kind of weather on October 26, 1998 and absolutely no evidence that some children did not own shoes. There was testimony that the youngest child was in a tee shirt, diaper, and one shoe. Mother explained, however, that he was dressed for a nap and, therefore, not in regular clothes. No one testified such clothing was inappropriate for a nap in that weather. Nor was there any evidence that the other children were inappropriately dressed.
Second, the record is devoid of any evidence of trash in the house, unless the dissent is referring to the testimony about broken glass, which testimony the witness later contradicted. The actual evidence is that there was garbage strewn in the backyard. Mother explained, however, that a dog had been loose in the neighborhood.The mess had simply not been cleaned up at the time that the social worker arrived at the scene. As to the mattresses, while there is controverted testimony regarding one box spring resting on top of four milk crates, the testimony describes only one mattress, not the plural described by the dissent.
Third, there is no evidence in this record that the neighbors reported the children were wandering in the street. In fact the record provides evidence to the contrary. Regina Burton, the social worker who went to the house instead of Michele Lee, testified that by the time she and the police had arrived mother was sitting on the front steps. (Tr. 148, 165.) It was at this point in time that the social worker observed a child descending the steps from the upstairs apartment. The record in this case shows only that the neighbors reported the children were home alone and nothing more.
Further, the dissent tries to make the length of time mother was absent a matter of dispute. It is not. No one disputed in this record how long the mother said she was gone.
Finally, the dissent claims the children were also poorly fed. This assertion is astonishing because the social worker specifically testified the children were not malnourished in any way. (Tr. 96.) Nor is there any evidence in this case that the police called the Kids Hotline on October 26, 1998.
Under the Fourteenth Amendment's Due Process Clause, parents have a fundamental right to make decisions concerning the care, custody, and control of their children. Troxel v. Granville (2000), 530 U.S. 57,120 S.Ct. 2054, 147 L.Ed.2d 49, at syllabus. Given the constitutional protection that parents have, it would be a travesty to terminate permanent custody on the basis of a prior hearing that a parent was not present at or a party to.
Further, the dissent cites several facts purportedly from the police. In the case at bar, not one officer, however, appeared at the September 30, 1999 hearing. The dissent's claim, again, is not based on the record.
We reverse the judgment of the trial court and vacate its order of permanent custody.
It is, therefore, ordered that appellants recover of appellee their costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., J., CONCURS; MICHAEL J. CORRIGAN, J., DISSENTS (See Dissenting Opinion).
[1] See In Matter of Jacob William Hauserman (Feb. 3, 2000), Cuyahoga App. No. 75831, unreported, 2000 WL 126754. No child endangerment charges were ever brought against the parents.
[2] The father of the three older boys did not participate in the hearings. For simplicity, we refer to Mr. Tackett as father throughout the opinion.
[3] This incident occurred approximately ten days before the permanent custody hearing for Jacob was to take place.
[4] By the time of the hearing, the parents had reunited and were living with a friend who owns a three-bedroom home and is willing to take the family in. The parents were also saving to obtain their own home. Additionally, the children's Aunt Brenda has offered to take custody of two of the children, and the family friend Robin Jarvis has offered to take the other three a plan that could maintain the pre-existing family bond. Nothing in the record showed the housing Brenda and Robin offered to be inadequate.
[5] The mother denied there were any milk crates.
[6] Contrasting with the account of their housing by the County is the account of the living conditions in Pike county by an investigator in that county: there was no concern regarding the care and housing of the children.
[7] Michelle Lee acknowledged receiving lengthy reports of visitations with no problems noted.
[8] Father is now employed as an iron worker six days a week.
[9] Mother successfully completed the earlier case plan of 1997.
[10] See State ex rel. Galloway v. Indus. Comm. (1926), 115 Ohio St. 490,154 N.E. 736; Klick V. Snavely (1928), 119 Ohio St. 308, 164 N.E. 233; Hughes v. Butler Cty Bd. Of Revision (1944), 143 Ohio St. 559,56 N.E.2d 63; Krahn v. Kinney (1989), 43 Ohio St.3d 103,538 N.E.2d 1058.
[11] Two of the five children are from the mother's first marriage.